Friday, November 7. The Judges delivered their opinions.
* Judge Tucker.
Before I enter upon the points which I purpose to consider in this case, I shall premise, that both from the bill and the evidence, I am fully satisfied that Lee and Colston were originally partners in this bargain, probably from its first inception, previous to Long's visit to Colston's house; and that Lee was from that period the agent of both, and that whatever Lee did in the business was binding upon Colston, being matured and concluded in his presence. That Lee was, probably, as well informed as Long, of the situation of the property in England, before the parties met at Alexandria; and that although there is a charge of misrepresentation made against Long in the bill, there is no proof of any representation whatever from him to Colston, in the character of a purchaser, or one treating for a purchase. That as Colston seems to have studiously concealed his participation with Lee, in the contract then in agitation between Lee and Long, and denied any intention to treat with Long for the purchase, the conversation between him and Long is not to be regarded as between persons treating about a bargain, but merely as between indifferent persons.
The original contract, after reciting the nature of Mrs. Long's title, and that the proceeds of her estate were invested in the English funds, (not particularizing which of them,) contains a covenant on the part of Long and wife, in consideration of the covenants therein after contained on the part of Colston, to assign and convey to him all the right, title and interest of Long and his wife therein, with a covenant for further assurance. &c. In consideration of *120 which, Colston agrees to pay Long 20,000 dollars down, upon the execution of the contract, viz. 5,000 dollars in cash, the “ residue in lands situate in the State of Kentucky “ and the territory N. W. of the river Ohio, to be selected “ from a schedule of locations and surveys thereto annexed, “ and part of the covenant, by Long, for which Colston “ is to be allowed two dollars per acre, and of which he is “ to make every necessary conveyance in fee-simple, “ against the claims of himself and his heirs, and inasmuch " as some of them are only entered, Colston to bear the “ burthen and expense of their being surveyed. And further, “ as the value of the said estate (in England) is not “ ascertained, and the parties mutually suppose that its “ value, when ascertained, will far exceed 20,000 dollars, “ Colston covenants to execute a bond to Long, to pay him “ whatever may be the excess beyond the 20,000 dollars, at “ the rate of one pound currency for a pound sterling, after “ deducting *by the same ratio the 20,000 dollars aforesaid.” Then follow some other covenants not material to consider; then a covenant that Long and wife shall execute a cotemporary power of attorney to Colston, empowering him to receive the value of the estate, &c. but the appointment of agents in England shall be made by both parties—and then this clause—" And further, the “ said Colston is to proceed with every possible dispatch to “ ascertain and secure the value of the estates thereby covenanted “ to be transferred, and to bear all expense attendant “ thereon. And further to avoid every opening for “ after construction, and render the meaning of the parties “ as explicit as possible, it is understood that Long and “ wife are only to convey their title and interest to the said “ estates, and that of their joint and several heirs. And " that if any change or convulsion in the government of “ Great Britain, should occur, as an obstacle to the recovery “ of the said estates or the proceeds thereof vested in the " funds, they are not to be contemplated as responsible “ therefor, and as to the sum paid, no reimbursement shall “ take place, and that if any such event should happen, the “ said Colston, on the other hand, is not to be bound by “ his bond.”
On the same day Colston with Lee his security executed a bond to Long in the penalty of 100,000 dollars, in the condition of which, after reciting the former part of the agreement, as far as the stipulation to pay a pound currency, for a pound sterling of whatever should be received in England by Colston, the words of the bond proceed thus, " whereby it was meant that for the entire value of the *121 “ said estates or stock in the funds in sterling money of the “ kingdom of G. Britain, the said Colston was only to give “ the said Long, only one pound Virginia currency, for “ one pound sterling, &c.
Where there is a written agreement, the whole sense of the parties is presumed to have been comprised therein, and it would be dangerous to make any addition in cases where there does not appear any fraud in leaving out any thing. This is a general rule. (5 Co. 68. 1 Fonb. 200.) But the parties to this instrument have taken uncommon pains to manifest their full sense of the bargain, as expressed in the original articles of agreement, by that clause which professes to avoid every opening for after construction, and render their meaning as explicit as possible. If then the agreement thus concluded and explained, can *admit of a satisfactory explanation, we are bound to give it that, and that only which the words will bear.
I shall premise, that the consideration and inducement to the agreement on the part of Long and wife, is not the payment of the sum of 20,000 dollars, in the manner proposed, as a sum or price in gross, but that he undertakes in consideration of the covenants therein after contained on the part of Colston; by which it appears clearly to my apprehension that the 20,000 dollars was considered by both parties as a partial payment only, for an estate, the value and amount of which depended upon future information and computation: for neither party professes to know the real value or amount of the estate, though both parties acknowledge their belief, that it will far exceed the value of the 20,000 dollars. Let us suppose a merchant anxious to purchase a large crop of wheat just cut, but not yet threshed out, was to agree with the owner of the wheat for the purchase of his whole crop, which both parties supposed would far exceed a thousand bushels, and to pay him down 1,000 dollars, on executing his contract, and at the same time to give his bond to the owner to pay him whatever might be the excess beyond 1,000 bushels, at the rate of one dollar per bushel, after deducting the 1,000 dollars paid by the same ratio. Could any one hesitate to pronounce that this was a bargain for the crop, at the rate of one dollar per bushel, and an advance made in part payment at the rate of one dollar per bushel, and to pay for any excess at the same rate ? Then would not equity say, in case the crop should fall short of 1,000 bushels, the owner must refund to the purchaser as many dollars, as the wheat falls short of the sum advanced? To my apprehension such a construction is irresistible. For as the bargain, was not to *122 pay a sum in gross, for the wheat in gross, let it hold out more or less than 1,000 bushels, but to pay according to the number of bushels, whatever number there might be above 1,000, so the principle of mutual and reciprocal benefit and loss, which enters into all contracts, in which there is any hazard which neither party has expressly taken upon himself to bear, requires there should be an abatement in case of a deficiency below the value of the sum advanced.
But it has been contended by the appellant’s counsel, that the explanatory clause, at the end of the agreement, shews it was the intention of the parties that there should be no reimbursement of the 20,000 dollars, in any event. Let us then suppose that our wheat merchant and the owner *had added a similar explanatory clause in these words —“ It is understood, that if by any accident the wheat “should take fire, and be burnt up before it is delivered, “the seller is not to be contemplated as responsible therefor, “ and, as to the sum paid, no reimbursement shall “ take place, and if any such event should happen, the “ buyer, on the other hand, is not to be bound by his bond." Could this stipulation be understood as having any relation but to the destruction of the wheat by fire? Or could it in any manner be construed to relate to the just quantity which the whole crop should amount to? I conceive not.
The agreement then is to my mind clear, and explicit enough to shew that the 20,000 dollars, to be advanced, was not a price in gross, but an advance made upon the mutual idea of both parties, that the value of the estate would far exceed it, subject to a final adjustment, when the value of the estate should be finally known, at the rate of pound for pound; at which rate, in case of a deficiency, the seller was to refund, as well as to receive in case of excess—there being nothing in the agreement that shews me Colston took the risk of the amount upon himself entirely.
But it will be said that a Court of Equity will admit of evidence dehors the deed, in case of fraud, concealment, or misrepresentation, between the parties, or mistake or misapprehension by the drawer of the deed, (1 Fonb. 117 add 200. and the references.) The doctrine is not denied, but its application to the present case may, I apprehend, be fairly doubted. Let it, however, be granted that it ought to be admitted in this case.
It is a maxim, that contemporanea expositio est optima: and any collateral fact done by the parties at the time, which serves to illustrate their meaning and intention is, *123 in my opinion, entitled to the highest respect, where evidence dehors the deed is admitted to explain the intention of the parties to the contract. Such was the bond executed by Colston and accepted by Long, on the same day, and probably at the same moment, as the original agreement; whereby it is expressly declared that “ the meaning of the “ parties, in the original contract, was that for the entire “ value of the estate or stock, Colston was only to give “ Long only one pound currency, for one pound sterling.” The repetition of the word only in the same sentence, and even in the same line, however unnecessary and ungrammatical, affords some evidence of the solicitude of the parties that the contracts hould be distinctly understood. *And this explanation corresponds with and confirms my interpretation of the original agreement.
The evidence of Mr. Lewis, the counsel who drew the papers, is relied on to prove that the intention of the parties was, that no reimbursement of the 20,000 dollars advanced, was to take place in any event, of what nature soever; which words do not occur either in the agreement, or the bond, both which were, I presume, prepared by Mr. Lewis. To come at a fact like this, (I shall say in the words of lord Hardwicke in a similar case,) it is certain there ought to be the strongest proof possible.(a) I was directed, says Mr. Lewis, to covenant between the parties that Colston was to give Long 20,000 dollars in prompt, to be discharged by 5,000 dollars in cash, and 15,000 dollars in military lands: Colston to be allowed two dollars per acre; 2d. If there should be any surplus value of the estate beyond the 20,000 dollars, Mr. Colston was to have it, every pound sterling value for a pound currency; the terms of the bargain against Long were contemplated to indemnify the purchaser against the expense in clearing out the title from the pending law suit, &c. 3d. Upon the final ascertainment of the value of the estate, the 20,000 dollars were to be deducted at the same ratio from the cash value; and, 4th. The parties were only to make special warranties of the property sold and that received in payment. Such, we are told, were the contents of the notes furnished him to draw the contract by, which it has happened unfortunately, were not retained by him. If they had been retained, they, and they only must have been resorted to, to shew there was a mistake in the agreement, as not conforming to them. In the case of Baker v. Paine,(b) the articles of agreement in a case not very unlike this were rectified by the minutes. But here the minutes, as detailed by Mr. Lewis, correspond with the *124 agreement, Mr. Lewis no where says he made any mistake in drawing the agreement, but enters into a long detail of his advice to Long, and the reasons upon which it was founded. He mentions, indeed, a question propounded by Gen. Lee to Long, as they were coming out of Mr. Edmund Lee's office, viz. “ Mr Long, provided we do not receive “ the 20,000 dollars, do you mean to reimburse them ?" With the answer—“ I make no such bargain." But these were answers to leading questions propounded by Long, and have therefore less weight with me than it Lewis had mentioned them himself; and, even then, I should have thought they might be applied to the event of a convulsion *or revolution in England, so as to agree with the bargain; but not by so loose a question and answer to contradict it. Lewis, by his own account, felt great solicitude for Long's interest, and was employed part of two days in drawing the papers; duplicates of which were made out by him, and executed by the parties. It would be wonderful, under such circumstances, if he omitted any thing through mistake. This is not like the case of Flemming and Willis; it approaches nearer to the case of Lady Shelburne and Lord Inchiquin,(a) where parol evidence to prove a variance between articles and instructions was indeed admitted, but considered as having no operation on the case. There being no other evidence on this point, I conceive the meaning and intention of the parties is too fully expressed in the agreement itself to admit of doubt.
Much stress was laid, in the argument, on the inequality of the contract, in favour of Colston. But inequality between, the sum paid and received, does not of itself make the consideration inadequate: If it did, there would be an inadequate consideration paid or received, on every foreign bill of exchange drawn above or below par. In this case Colston was to pay currency, pound for pound, for sterling. But when was he to receive the compensation for 20,000 dollars, which he was to advance? Not till after the death of Burgess Ball, who was tenant by curtesy of the English estate; nor until an adjustment of a law suit, already depending more than fifty years—nor until other legacies were paid and discharged, and the balance could be ascertained. The first of these events, only, has as yet happened; and that happened three years after the contract, and might not have happened in thirty. There is nothing then in favour of Long upon this point. Whether either of the parties knew of these legacies, until the meeting with Shermer in January, 1798, more than si *125 months alter the bargain was concluded, does not, I think, very, clearly appear. Be that as it may, from that period Colston had reason to doubt whether the money paid, and the lands he was to give to the amount of 15,000 dollars more, would not overgo the amount of the English estate, which he was likely to receive in virtue of his bargain. And, for any thing that appears in this record, that doubt has daily acquired strength, from the information of the agents of both parties, and still remains undetermined.—Upon these grounds, I am of opinion that Colston. was well entitled to the aid of a Court of Equity; and that, *under the circumstances of the case, the relief sought, and that which has been obtained, so far as it goes, were both proper; since thereby the contract may be fulfilled on, both sides, according to their original agreement, and justice done by a fair adjustment of accounts in a Court of Equity; which probably could not have been effected in any other mode. That a bill for specific performance, lies as well on the part of the seller as the purchaser, is evident from the case of Langford v. Pitt,(a) and Stourton v. Meers, there cited by the Master of the Rolls. I am the more confident in this, because Long was apprised, as appears by the agreement, that some of the lands he was to receive had only been entered, and Colston must have time to survey them and obtain patents. The conveyances in fee-simple were demanded by Peacock as attorney for Long, as furnishing a ground for an action at law for breach of covenant, in September, 1798; about fourteen months after the bargain, and probably much sooner than patents could be obtained in the ordinary course of proceeding, whatever diligence Colston or his agents may have used for that purpose. Whether this was too rigorous a procedure on the part of Long, or not, it is unnecessary to say; but I think the injunction, upon the terms offered, was rightly awarded. Colston had performed a part of his contract to a very valuable amount, by the advance of 5,000 dollars. The agreement, as before observed, shews he could not possibly execute a conveyance in fee-simple for all the lands, part of them being only entered. It is a principle in equity, that where a party is, by accident, or other circumstances beyond his own controul, prevented from executing the whole of his contract in specie, he shall be permitted to perform it as far as he can. Pollard v. Rogers, in this Court, was cited by Mr. Wickham to this effect. And, even if he can now make a title to the lands, it seems reasonable he should be permitted so to do; as in Langford v. Pitt, and Stourton v. Meets, above referred to Colston, as I understand his offer in his bill, has ac *126 tually executed a conveyance for so much of the lands, which Long was to have of him, as is equal to the balance of the 20,000 dollars; which conveyance still remains in full force. If there were any of the lands selected by Long not comprised in that conveyance, perhaps the Court ought to permit him to ascertain his damages at law for the amount of the lands so omitted. But still, I apprehend, no execution for the same ought to be permitted, but the verdict be certified *into the Chancery, there to wait the final issue of the cause, upon a settlement of the accounts between the parties—with this difference, (if, upon examination, it should appear necessary,) I am of opinion that the decree be affirmed.
Judge Roane.
This is a bill of injunction exhibited by the appellee, praying to arrest the proceedings in an action of covenant brought against him by the appellant, in the District Court of Winchester. While that action was yet pending and undetermined, the Chancellor awarded the injunction, and, without requiring the appellee to confess a judgment at law, transferred to his tribunal the entire cognisance of the cause, which involved the construction of a contract. By that contract, the appellant had bound himself to convey to the appellee, his and his wife’s title to an estate in England, called the Chichester estate; whereupon the appellee was to pay him down five thousand dollars in cash, and fifteen thousand dollars in military lands, at two dollars per acre, and to pay him one pound currency for every pound sterling which the said estate (which was in the English funds) should, when finally settled, be found to amount to, over and above the said sum of twenty thousand dollars. So far the parties are agreed in their construction of the contract: but the appellee contends that, in the event which is now suggested to have taken place, of the estate’s falling short of that sum, a proportional reimbursement should be made out of the said sum of twenty thousand dollars; whereas the appellant contends, that in no event was he liable to submit to such an abatement.
This is the grand question between the parties. The covenant, on the part of the appellant, is, that he would convey the right to the English estate; (which, in the declaration in the action at law, is alleged to have been done, and which he might, in that action, have duly shewn to have been done, had not the progress thereof been arrested;) and the covenant, on the part of the appellee, the breach whereof is now complained of, is, that he has failed *127 to transfer the military lands, which, by the contract, were to have been immediately and promptly conveyed. Notwithstanding the existence of this action upon this covenant, another action would lie on the same contract in behalf of the appellant, in the event of an excess beyond the twenty thousand dollars, and a non-compliance on the part of the appellee, with his stipulations in relation thereto; and an action would also have lain in favour of the appellee, *(if his construction of the contract be correct,) in the event of the value of the estate falling short of the before-mentioned sum. At the same time it is readily admitted, that in this very action for damages for not furnishing the stipulated deposit, it was competent to the appellee to exhibit to the Court and Jury and contend for his construction of the contract, in this particular, and to shew the existence of an actual deficiency in the estate, by way of mitigation of damages.
But the appellee, neither choosing to do this by way of defence in the aforesaid action, nor to rely on it in any future action to be brought by him against the appellant, grounded on the event which is now suggested, to have taken plate, has evoked the subject from the Court of Law to the Court of Equity, and prays the latter tribunal to construe and decide, upon the contract.
A translation of this kind can only be justified in the case before us, by particular grounds of equity existing on the part of the appellee, or by reason of the verity of that general and broad proposition, which is stated in the commencement of the decree in question.
In examining into the particular grounds in the case before us, it cannot be pretended that the appellee was under any necessity of coming into a Court of Equity for relief against any forfeiture incurred by him in relation to the military lands contracted to be conveyed; or the like; 1st. Because he expressly states in his bill, " that when “ the appellant applied to him for a conveyance of the said " land according to contract, he offered to do so, provided “ the appellant would agree to reconvey, or be otherwise " responsible, in case of a deficiency of his claim on the " Chichester estate;" thereby admitting his ability to convey, and requiring, as a condition thereof, a new or explanatory stipulation on the part of the appellant; 2d. Because the military lands aforesaid, being holden by the appellant by entries and surveys only, in most instances, if not all, and this known to the appellant at the time of the contract, he could never have expected from the appellee more than an immediate transfer of his rights there *128 to, or, at most, regular deeds for them hereafter, when the titles should be completed; and, therefore, such a transfer would have been a compliance on the part of the appellee with his stipulation, and received as such in the trial at law; and, 3d. Because, if there were any of those lands selected by the appellant, to which the appellee has not, and perhaps never can obtain a title, (as is alleged by *him to be the case in relation to two entries in the name of Samuel Carey; see his letter to the appellant, of March 18, 1799,) this circumstance, so far from affording him a ground to come into a Court of Equity for a specific performance, would, perhaps, have been a reason for confining his adversary to his action at law for damages: for it is said in Cuddee v. Rutter,(a) “ that the Court, in case “ of a contract for the sale of land, which the party has “ not at the time of the contract, will not decree a spe- " cific “ performance of the agreement as to the land, but “ leave the buyer to recover his damages at law for non-performance “ of the agreement.”
With as little reason can it be said that the appellee might go into the Court of Equity on the ground on which bills of quia timet are usually granted.
By his contract, he was bound to convey the military lands immediately, unclogged with any condition whatsoever; and the appellee trusted to the appellant’s personal responsibility to make good the deficiency; (if that event was contemplated and provided for in the contract;) but the ground he now takes in his bill goes to clog the transfer of the lands themselves with a new condition of reimbursement. This ground of complaint is moreover untenable, because it is as reasonable that the appellee should rely on the personal responsibility of the appellant in case of deficiency, as that, in case of excess, the appellant should rely on that of the appellee; who had, from the moment of the signature of the contract, the estate of the appellant in his hands. It appears from the contract that both parties were safe and responsible men, and whatever the true construction of the contract may be as to the appellant’s liability to make reimbursement in case of deficiency, there is no pretence to say that such liability was attached to the land by way of lien. These remarks are made in objection to the appellee’s coming into a Court of Equity on this ground: at the same time it is readily admitted that if the cause were properly before the Court of Equity, and ripe for a final decision, by reason of the English estate being fully and finally settled and ascertained, it might be proper for equity, which delights to do complete justice, to settle *129 the ease by making an abatement in case of deficiency out of the military lands themselves, which are contracted to be conveyed.
I come now to consider the general and broad proposition contained in the commencement of the Chancellor’s decree. I will premise that I highly approve of the jurisdiction of Courts of Equity on the point in question, as settled *by successive and well-weighed decisions; so far as it is auxiliary to the jurisdiction of Courts of Law; and so far as it goes to give to parties, who wish it, the specific execution of their agreements. But this jurisdiction must have limits: it ought not to ingulph and destroy the salutary jurisdiction of the common law. I wish not to see this small and precious germ which, within times not far remote, took root, and was with difficulty nourished as a wholesome and goodly plant, yielding its friendly aid to the soil on which it grew; now outstrip its proper size, outrage its own nature, and like the far-famed Upas tree, by its deleterious effluvia administer death and desolation to all around it. I wish not to yield up every thing to that encroaching jurisdiction, which knows not the inestimable trial by jury, and is blind to the incalculable superiority of viva voce testimony. If there is any advantage arising from the union in this Court, of the common law and chancery jurisdictions, it is not the least that such union affords a check against the proneness of all men in all situations to advance and extend the sphere of their own authority. Under this organization, this Court, taking side with neither of the rival jurisdictions is free to restrain them both within their proper limits.
The broad proposition now in question is this, that in case of a specific agreement, although the party grieved may have elected to proceed at law for damages arising from a breach thereof, yet, as he might have resorted to equity for a specific performance, and as in equity remedies ought to be reciprocal, the aggrieving party may compel his adversary to abandon his common law remedy and hold him down to a remedy for specific performance.
Whether this proposition, if true in the extent here contended for, does not go to the utter annihilation of the common law jurisdiction in such cases, and make a most important innovation in our system of jurisprudence, I will briefly inquire?
In the excellent treatise of equity, upon which Fonblanque has annotated, we are told, vol. 1. p. 27 that formerly the law of England was very defective in not providing for a specific performance of agreements :—“ but it “ *130 proving a great hardship in particular cases to be left “ only to the uncertain reparation by damages, which the “ personal estate perhaps may not be able to satisfy, Courts “ of Equity therefore, where there was a sufficient consideration, “ did, in aid of the common law, compel a specific “ performance.” Nothing is more clear than that this provision was introduced in favour of the person aggrieved by the breach of the *agreement; as is manifest from what is said about the failure of the personal estate, &c.; nor than that: this provision was (as it is expressed) in aid and not in exclusion of the jurisdiction of the, common law:- Yet we are told, ib. p. 31. that “ the common lawyers continually “ poured out their complaints against this encroachment, “ as they imagined it, on the ancient municipal “ laws.” Loud indeed would their complaints have been, if, instead of the just and reasonable pretension then advanced and now sanctioned by the concurrence of ages, this gigantic innovation had then been meditated.
I take it therefore to be a well established principle, that after a breach, a plaintiff may elect to proceed at law for reparation in damages, and that he cannot thereafter be compelled to go for the thing in specie unless he wants it,(a) or unless some particular grounds of equity exist, on behalf of the party breaking the contract, excusing and relieving against such breach, and shewing that, according to the principles of equity, the contract ought, nevertheless, to be performed in specie.
It was argued, but ought not seriously to have been alleged, by the appellee’s counsel, that the sustaining the action at law injuriously converted the appellant’s claim from land into money. The answer is, 1st. That this objection is as broad and untenable as the general propositions just examined; and, 2dly. That it results from the principles of law and the contract of the parties, that, in case of breach thereof, the appellee has promised to pay to the appellant as much money as should be assessed by a Jury, for reparation of the injury: his original contract, followed up by a breach thereof, completely estops him from making the objection. It may truly be said that, in contracts for so fluctuating a species of property (in point of value) as those military lands were, time and punctuality are all important to the buyer; and that the default of the seller in not making a due transfer at the time, when the agreed price might have been procured therefor in the market, shall not prejudice the buyer in the event, which is alleged to have taken place, of an enormous depreciation in the value of military lands. If a loss is thereby sustained by the appellee in the present *131 instance, it is a loss without an injury, and arose from his own act in not performing his agreement by transferring the lands, but, instead thereof, keeping them in his own hands and at his own risk.
As to the objection, going to the uncertainty of a reparation *in damages, it applies equally, at least, in all other cases but does not overrule the general doctrine of the law giving the action. In the case before us, that objection has little weight, for the parties have agreed on the price of the lands in question: and, indeed, in all cases, capricious or injurious assessments of damages by Juries are controulable by the superintending power of the Courts. The objection therefore ought to be wholly disregarded in the case before us.
Such are the grounds of my opinion in the present case.
Not believing that the appellee was competent to come into a Court of Equity, when he exhibited his bill for an injunction, or that such Court ought to have taken cognizance of his case, (the Court of Law being the proper tribunal to construe the contract, and determine the action pending before it,) I have deemed it premature and unnecessary to enter at all into the merits of the contested question arising out of the contract. I have only incidentally examined that contract, in connexion with other circumstances, to enable me to determine whether the appellee ought to have obtained foot-hold, and received countenance in the Court of Equity. On a full consideration of the case, I think that he ought not; but that his application for an injunction should have been rejected, and his bill dismissed; which (reversing all the subsequent proceedings in Chancery) ought now to be the judgment of this Court.
Judge Carrington.
I am of opinion that the injunction obtained by Colston was premature, the value of the English estate being not yet finally ascertained. It ought therefore to be dissolved, but without prejudice to any suit which he may hereafter bring to be compensated for the deficiency, when the amount thereof shall have been ascertained.
Judge Lyons.
Neither a Court of Equity nor of Law can vary men’s wills or agreements.(a) Courts should endeavour to understand them truly, but not to extend or abridge them. They may construe equitably when words admit of doubt, but cannot controul a lawful stipulation or contract, nor relieve against stated damages.
*132 What was the contract in this case? That Colston should pay Long twenty thousand dollars upon the execution of a conveyance for transfering to the former all the right of the latter and of his wife, to what was called the Chichester estate, in England; that he should pay in cash five thousand dollars, and the balance in military lands; and, as the value of the Chichester estate was not ascertained, but supposed to exceed twenty thousand dollars, Colston *was to execute a bond to pay, at the rate of currency for sterling, for its excess above that sum. Was not this contract lawful and sufficiently certain? The bond given for excess recites the agreement, and explains its meaning to be, that, for the entire value of the estate or stock, Colston was only to give currency for sterling. Its condition was, that Colston should pay for whatever might eventually be obtained over and above twenty thousand dollars. Long and wife conveyed the English estate, and demanded performance of the agreement by Colston, who refused to convey the military lands, unless Long would promise to reconvey in proportion to what the English estate, when its value was ascertained, should fall short of six thousand pounds sterling, which Long refused to do, as that was no part of his contract: upon which Long brought an action of covenant at law for the breach of the agreement, and Colston brought a suit in Chancery to enjoin him from proceeding upon it.
An injunction was granted and made perpetual. The question is, whether Colston, according to his agreement, ought not to have paid the twenty thousand dollars, immediately on Long's making him the deed, and whether he had a right to any aid or relief in equity, until the value of the English estate was finally ascertained?
Long did not agree to wait for that; but was to receive the twenty thousand dollars immediately, and says he was not to refund any part of it, in case of deficiency. But that is not the present question; for that can be decided only when the value of the English estate shall be finally ascertained in England.
I think Long had a right to the twenty thousand dollars, immediately on executing the deed to Colston, and was not obliged to enter into a new contract for refunding, in case of deficiency; that he had a right to sue at law for the breach of the original contract; and that Colston was premature with his bill, before the value of the English estate was finally ascertained, according to the agreement.
*133 I am, therefore, of opinion, that the injunction should be dissolved, and the bill dismissed, without prejudice to any other suit he may bring in equity, after the value of the English estate shall be finally ascertained.
The decree of the Court was, that the injunction should be dissolved, and the bill dismissed, without prejudice.

(a) 1 Ves. 319. Henkle v. Royal Exchange Assurance Company.

(b) 1 Ves. 456.

(a) 1 Bro. Ch. Cases, 338.

(a) 2 P.Wms. 680.

(a) 5 Viner, 540. 2d Resolution.

(a) 1 Fonb. 29. 139. 2 Bro. Ch. Cases, 343. dict, per Lord Chancellor, in Errington v. Annesly.

(a) 3 Tuck. Bl. 485.